RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0194P (6th Cir.)
File Name: 04a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WILSON AIR CENTER, LLC,
*Petitioner,*

*v.*

No. 01-4037

FEDERAL AVIATION
ADMINISTRATION,
*Respondent,*

MEMPHIS-SHELBY COUNTY
AIRPORT AUTHORITY,
*Intervenor.*

On Appeal from a Final Decision of the
Federal Aviation Administration.
No. 16-99-10.

Argued: March 12, 2003

Decided and Filed: June 23, 2004

Before: MARTIN and ROGERS, Circuit Judges;
EDMUNDS, District Judge.*

_____

* The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

## COUNSEL

**ARGUED:** David Wade, MARTIN, TATE, MORROW & MARSTON, Memphis, Tennessee, for Petitioner. Anthony A. Yang, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** David Wade, Richard M. Carter, MARTIN, TATE, MORROW & MARSTON, Memphis, Tennessee, for Petitioner. Anthony A. Yang, Michael Jay Singer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. R. Grattan Brown, Jr., GLANKLER BROWN, Memphis, Tennessee, Rise J. Peters, Jeffrey A. Schwarz, Pablo O. Nuesch, SPIEGEL & McDIARMID, Washington, D.C., for Intervenor.

## OPINION

BOYCE F. MARTIN, JR., Circuit Judge. Wilson Air Center, LLC appeals from the final decision of the Federal Aviation Administration. Wilson filed a complaint with the Administration alleging that the Memphis-Shelby County Airport Authority's differing treatment of Wilson and Wilson's competitor, AMR Combs, Incorporated,[1] violated its obligations under federal law prohibiting unjust economic discrimination, 49 U.S.C. § 47107(a)(1), (5), as well as prohibiting the creation of "exclusive rights," 49 U.S.C. § 40103(e). The Administration rejected Wilson's claims; we AFFIRM.

_____

[1]Memphis Aero Corporation is the predecessor to AMR Combs, which purchased Memphis Aero in 1987. Thereafter, Signature Flight Support purchased AMR. This opinion will collectively refer to these corporations as "AMR."

## I.  BACKGROUND

Memphis International Airport is a public-use, commercial-service airport owned and operated by the Memphis-Shelby County Airport Authority, which serves as FedEx's principal hub for its cargo operations.  AMR and Wilson function as the Airport's fixed-base operators, commonly referred to as FBO's, which "are small plane gas and repair stations which service private, nonscheduled aircraft."  *Kemmons Wilson, Inc. v. FAA*, 882 F.2d 1041, 1042 (6th Cir. 1989).

The Airport's development has been financed partly by federal funds pursuant to the Airport Improvement Program as authorized by the Airport and Airway Improvement Act of 1982.  *See* 49 U.S.C. § 47101, *et. seq*.  As a recipient of funds under the Program, the Authority must give assurances that it will not engage in "unjust discrimination," 49 U.S.C. § 47107(a), and will not grant any aeronautical service provider an "exclusive right" to use the airport, 49 U.S.C. §40103(e).  Wilson, believing that the Authority breached these assurances, filed a complaint with the Administration pursuant to 14 C.F.R. Part 16, alleging that the Authority had violated its federal obligations.  The facts underlying this complaint are developed as follows.

### A.  Lease agreements with AMR

Before Wilson began its fixed-based operation, AMR was the Airport's only fixed-based operator.  AMR had several preexisting leasehold agreements with the Authority, which were consolidated into a new lease agreement in December 1979.  The lease, which covered the area located in the central part of the airfield–the South Complex, granted AMR an option to extend the lease term through 2005 if it invested over a million dollars in capital improvements on the property.  In 1985, AMR supplemented a preexisting lease agreement, which concerned its right to occupy the Administration's old control tower, by adding a parcel described as the General Aviation Building.

AMR also held preexisting leasehold agreements with the Authority covering parcels in the North Complex.  In 1986, AMR entered into a "Consolidated and Restated Lease Agreement" for parcels of land located at Airport's North Complex.  After AMR exercised an option to increase the duration of the lease, the lease term was extended to January 1998.

In 1987, after making the requisite capital improvements, AMR requested an extension of its lease term on the South Complex parcel.  AMR also requested that the Authority extend the lease terms on its other properties to coincide with the 2005 expiration date of its South Complex lease.  The Authority granted this request.  By 1993, when Wilson began its own fixed-based operation, with certain parcels removed from AMR's lease in the meantime, AMR's total acreage under its various leases was approximately 38.45 acres.

In 1995, AMR indicated its intent to expand its fixed-base operation by requesting that the Authority extend its North Complex lease beyond its 2005 termination date.  The Authority declined this request, explaining that the extension would interfere with FedEx's planned expansion. Thereafter, on June 5, 1995, AMR indicated its desire to terminate the North Complex lease in favor of a thirty-year lease of the South Complex, where it would relocate its entire operation and build a "new world-class executive terminal building along with additional hangar space to accommodate all tenants currently at the . . . North facility."  From 1995 through 1998, AMR and the Authority negotiated the terms of this transition–i.e., AMR's surrender of its North Complex leaseholds and its relocation to the South Complex.

In February 1998, the Authority and AMR entered into a "Consolidated and Restated Lease Agreement."  This lease, which is the source of Wilson's complaints, provided for AMR's incremental abandonment of its North Complex holdings to be completed by the end of 1999–approximately six years before AMR's lease of these parcels terminated.

After securing AMR's release from the North Complex, the Authority, on March 1, 1998, entered into a lease agreement with FedEx for these same parcels.

On May 21, 1998, the Authority and AMR entered into a restated lease agreement for the South Complex, which was to expire on June 30, 2025. Under the lease, AMR agreed to "expend a minimum of $4,500,000 in capital investments to construct a minimum of two (2) new 10,000 square foot hangars and to rehabilitate the General Aviation Building over a period of seven (7) years beginning June 1, 1998 with a completion date of June 30, 2005."

The lease maintained the 1979 lease's rental rates for the South Complex until 2005–the original expiration date of the 1979 lease. The lease also maintained the rental rate for the General Aviation Building that was established in the 1985 lease covering that building. The Authority, however, agreed to abate AMR's rent for the General Aviation Building for a one year period, in exchange for AMR's rehabilitation of the aging building. This rehabilitation included the removal of asbestos and lead and the updating of the building's plumbing, electrical and HVAC systems. A separate agreement provided the rental rate for the 6.09 acres of taxiway that was conveyed to AMR by the 1998 South Complex lease.[2]

Additionally, the lease granted AMR options to lease three parcels of land adjacent to the South Complex. AMR was required to pay "option fees" for these parcels and could originally exercise its option at any time during the 1998 lease term. In response to Wilson's complaints, however, the Authority and AMR entered into an amended agreement that

---

[2]Generally, there is no rental rate for taxiways as they are accessible to the public. Because this taxiway, by virtue of changes in the Airport's design, became usable only to AMR, a rental agreement was reached for the exclusive use of the taxiway.

provided for an incremental development schedule that AMR was required to meet in order to retain the parcels.

**B.   Prior Lease Agreements with Wilson:  1993-1997**

In 1993, Wilson negotiated a lease with the Authority allowing it to begin operating as the Airport's second fixed-based operator. Wilson began its operation, however, only after a litigious battle with the Authority. Indeed, after the Authority declined Wilson's application to begin its own fixed-base operation to compete with AMR, Wilson filed a complaint with the Administration alleging that the Authority had created an "exclusive right" in favor of AMR in violation of federal law. The Administration concluded that the Authority's refusal was based upon its spatial restrictions and that any available space was earmarked for other uses. Therefore, the Administration dismissed Wilson's complaint.

Wilson timely appealed to this Court. We found that the Administration's "perfunctory adjudication" based upon only "cryptic evidence" constrained our ability to determine whether the Administration's decision was supported by substantial evidence. *See Kemmons Wilson*, 882 F.2d at 1045-47. Thus, we vacated the Administration's decision and remanded the case for an administrative hearing. *Id.* at 1047. On remand, the Administration determined that the Authority's refusal to lease land to Wilson in order for it to open a fixed-base operation was not motivated by "nefarious intent." To comply with federal law, however, the Administration ordered that the Authority negotiate with Wilson for the opening of a second fixed-base operation.

In July 1993, as a result of these negotiations, the Authority allowed Wilson to begin its own fixed-based operation by granting it a thirty-year lease of approximately twelve acres of undeveloped land for twelve cents per square foot. Additionally, the lease contained an option to lease an additional two and a half acres, which Wilson exercised. In December 1997, Wilson leased, under a separate agreement,

an additional 1.35-acre parcel at twelve cents a square foot, thereby increasing its leasehold to just over sixteen acres.

Wilson continually sought to expand its fixed-based operation at the Airport from 1997 through 1999. Specifically, Wilson expressed interest in leasing several pieces of Airport property including: a plot of land referred to as Hurricane Creek that was under a lease agreement with FedEx, a plot of land on which the Northwest Airlink Building was located, and the option parcels that, unknown to Wilson, the Authority had leased to AMR one week before its inquiry. The Authority entered into negotiations with Wilson regarding the Hurricane Creek and Northwest Airlink parcels. The negotiations included Wilson's proposals that the Authority lease Wilson the Northwest Airlink Building rent-free until June 2010, that the Authority demolish certain buildings on the Northwest plot and that the Authority, at its own expense, construct a ramp for Wilson's exclusive use across the Hurricane Creek parcel to provide access to the airfield.

For its part, with regard to the Northwest Airlink property, the Authority agreed to relocate FedEx at its own expense, demolish the buildings on the Northwest plot, and consider abating the rent for the Northwest Airlink building for one year in exchange for capital improvements. The Authority also noted that it would charge eighteen cents per square foot for unimproved ground rent and twenty cents per square foot for improved ground rent through the fifth year of any new lease term, at which time, the rent would be based upon the land's appraisal value. In response to Wilson's proposal for the Hurricane Creek Parcel, the Authority noted that it would not install the ramp as requested, but it would consider its other proposals once Wilson had provided the Authority with its master plan for development of the property.

## C.   Procedural Background

On August 16, 1999, unhappy with the Authority's response to its effort to expand its fixed-base operation, Wilson filed a complaint under 14 C.F.R. Part 16, alleging that the Authority's treatment of Wilson as compared to its treatment of AMR constituted unjust economic discrimination in violation of 49 U.S.C. § 47107(a), and created "exclusive rights" in violation of 49 U.S.C. § 40103(e).

The Director of the Administration's Office of Airport Safety and Standards after evaluating Wilson's complaint and the parties' pleadings, concluded that the Authority did not violate its federal obligations and dismissed the complaint. Wilson appealed to the Administration, which affirmed the factual findings and legal conclusions in the Director's decision. This timely appeal followed. On appeal, Wilson raises several arguments, which will be addressed in turn.

## II.  STANDARD OF REVIEW

When reviewing an order of the Federal Aviation Administration, we apply the standards of review as articulated in the Federal Aviation Act, 49 U.S.C. § 46110(c), and by default, the Administrative Procedure Act, 5 U.S.C. § 706. Under the Federal Aviation Act, the Administration's findings of fact are conclusive if supported by substantial evidence. 49 U.S.C. § 46110(c) ("Findings of fact by the . . . Administrator, if supported by substantial evidence, are conclusive."). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Singer v. Garvey*, 208 F.3d 555, 558 (6th Cir. 2000). We "must consider 'the record in its entirety . . ., including the body of evidence opposed to the [agency's] view.'" *Loral Def. Systems-Akron v. NLRB*, 200 F.3d 436, 448 (6th Cir. 1999) (quoting *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 487-88 (1981)), when reviewing the record for substantial evidence. Even if two different conclusions can be drawn from the evidence, we may still

find that the agency's factual findings are supported by substantial evidence. *Id.* Substantial evidence review "gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree which *could* satisfy a reasonable factfinder." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998).

Given the Act's silence regarding the appropriate standard for reviewing the Administration's nonfactual findings, we must look to the Administrative Procedure Act to supply the appropriate standard of review. *Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 717 (1st Cir. 1999). Thus, we review *de novo* questions of law, *see* 5 U.S.C. § 706, but we must give some deference "to the agency because it is charged with administering the statute." *Am. Nuclear Res., Inc. v. U.S. Dep't. of Labor*, 134 F.3d 1292, 1294 (6th Cir. 1998).

This Court reviews an agency's other findings and conclusions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Penobscot*, 164 F.3d at 719 ("With respect to other agency action, findings, and conclusions, the [Administrative Procedure Act] requires the reviewing court to hold them unlawful and set them aside if they are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.") (internal quotation marks omitted). Generally, we consider an agency's action "arbitrary and capricious" when the agency "'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 911 (6th Cir. 2000) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### III. ANALYSIS

### A. Evidentiary Hearing

On appeal, Wilson argues that the Administration abused its discretion by failing to provide it with an evidentiary hearing, as he argues the statute requires. Before addressing the merits of this claim, however, we must address the Administration's argument that Wilson has waived its right to argue this issue on appeal by not presenting it to the agency for review.

"The administrative waiver doctrine, commonly referred to as issue exhaustion, provides that it is inappropriate for courts reviewing agency decisions to consider arguments not raised before the administrative agency involved." *Coalition for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 461-62 (6th Cir. 2004). Administrative issue exhaustion is typically required by statute. *Sims v. Apfel*, 530 U.S. 103, 107 (2000) ("Initially, we note that requirements of administrative issue exhaustion are largely creatures of statute."). The statute at issue in this case requires that an objection be made before the agency or that there exists a reasonable ground for not having made the objection in order to obtain review of that objection. 49 U.S.C. § 46110(d). Section 46110(d) provides:

> (d) Requirement for prior objection. --In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Under Secretary, or Administrator only if the objection was made in the proceeding conducted by the Secretary, Under Secretary, or Administrator or if there was a reasonable ground for not making the objection in the proceeding.

49 U.S.C. § 46110(d).

Our review of the record convinces us that Wilson has waived the argument that the Administration abused its

discretion by failing to conduct an evidentiary hearing. As the Administration notes, Wilson expressly stated that it was not asking that the Administration conduct a full evidentiary hearing. In its motion for limited discovery, Wilson noted: "To be clear, Wilson is not requesting at this stage a full-blown 'evidentiary hearing.'" Again in its motion for limited discovery, Wilson noted that it "is not requesting a hearing at this time. Wilson is simply requesting that the Director exercise the FAA's discretionary powers . . . in order to permit leave for Wilson to conduct limited discovery . . . ." Wilson has not argued that there was a "reasonable ground for not making the objection," 49 U.S.C. § 46110(d), nor does our independent consideration of the issue supply one.

Given the foregoing, we refuse to allow Wilson to bypass the statutory requirement of administrative issue exhaustion by raising this issue for the first time in this appeal. *See Sims*, 530 U.S. at 108. Furthermore, we find Wilson's due process claims that are predicated upon the argument that the Administration erred in failing to conduct an evidentiary hearing similarly unexhausted, thereby foreclosing our ability to review those claims.[3]

---

[3]While Wilson argues that it did "raise the hearing issue in its appeal of the Initial Determination and the Administrator even quoted that concern," our review of the record demonstrates that Wilson's argument challenged only the adequacy of the Administration's investigation and that it did not request or argue that the Administration erred by failing to hold an evidentiary hearing. In its appeal of the Director's Determination, Wilson noted: "The explicit statutory and regulatory language under which the FAA is to conduct Part 16 proceedings requires the FAA to conduct a 'fair and complete hearing.' The FAA has broad latitude in its discharge of that requirement. In this case, however, the FAA not only failed to carry out its explicit statutory requirement to conduct a full and fair investigation, it also denied Complainant's Motion for Limited Discovery." We do not understand this argument as a request for an evidentiary hearing, nor do we understand it as an argument that the Administration erred by failing to conduct an evidentiary hearing.

## B. Failure to Conduct a Site Visit, Allow A Surreply, Grant Limited Discovery and Further Investigate

Wilson also argues that the Administration erred in failing to further investigate its complaint by limiting its review to the pleadings; by refusing to grant its motion for limited discovery; by refusing to conduct a site visit and by striking its surreply from the record. Relatedly, Wilson argues that the Administration's failure to conduct an investigation and permit discovery constituted a denial of its due process rights. We find these arguments unpersuasive.

First, we address Wilson's argument that the Administration erred in refusing to conduct a site visit. As the Administration notes, Wilson never explicitly requested a site visit, but rather simply offered to provide one. Because Wilson never explicitly objected to the Administration's failure to conduct a site visit, this argument is unexhausted and has been waived.

Second, we address Wilson's argument that the Administration erred in striking its surreply from the record. On November 14, 2000, Wilson filed a motion for leave to file a surreply. The Administration, citing 14 C.F.R. § 16.33, denied the motion, noting that Part 16 proceedings provide only for an appeal and a reply. Thus, the Administration concluded that the record was complete without Wilson's surreply. While acknowledging that the right to file a surreply is permissive, Wilson argues that the Administration used its discretionary powers to "abdicate its search for the truth." Specifically, Wilson argues that the surreply was necessary to correct a misstatement that the Administration made concerning Wilson's failure to file a master plan for the Northwest Airlink Building. We find Wilson's argument unpersuasive. As the Administration notes, Wilson does not argue that these materials contain new evidence or were unavailable to it to file with its administrative appeal, and under these circumstances we conclude that the

Administration did not abuse its discretion in striking the surreply.

Third, we address Wilson's argument that the Administration erred in failing to conduct further investigation and permit limited discovery. On September 7, 1999, Wilson filed a motion for limited discovery. The Director denied this motion reasoning that Part 16 proceedings contemplate an expedited process, which does not provide for discovery during the investigation stages of a complaint. *See* 14 C.F.R. § 16.213. We find no error in this ruling, nor do we find that the Administration improperly investigated Wilson's complaint.

The regulations require the Administration to conduct further investigation of a complaint when the pleadings set forth a reasonable basis for doing so. 14 C.F.R. § 16.29. Wilson argues that its complaint set forth a reasonable basis for investigation and as such the complaint necessitated "further investigation." We agree with this statement, but we believe that Wilson's complaint was further investigated as articulated in the regulations and therefore, we reject the factual basis for this argument.

The regulations provide the Administration with considerable discretion in choosing how best to fulfill its investigatory duties.[4] Under the process as delineated in

---

[4]The regulations on which Wilson's argument relies in pertinent parts, provide:

(a) If, based on the pleadings, there appears to be a reasonable basis for further investigation, the FAA investigates the subject matter of the complaint.

(b) The *investigation may include one or more* of the following, *at the sole discretion of the FAA*:

(1) *A review of the written submissions or pleadings of the parties*, as supplemented by any informal investigation *the*

Part 16, it is clear that the Administration has the discretion to determine its own need for further investigation and what that investigation should entail. Even Wilson apparently recognizes the Administration's discretion in conducting investigations as it notes in its appellate brief that "the procedure is permissive . . . and not mandatory."

Wilson's argument rests on its misreading of the regulations at issue. Wilson contends that "[t]he regulatory language concerning *further* investigation 'based on the pleadings' cannot reasonably be interpreted to mean only a pleadings review." We find this argument contrary to the plain language of the regulation. *See Henry Ford Health Sys.*, 233 F.3d at 910 ("We read statutes and regulations with an eye to their straightforward and commonsense meanings."). As quoted above, the plain language of the regulation indicates that "further investigation" may entail only a review of the pleadings, but that requirement may also involve more, if the Administration determines it is necessary. 14 C.F.R. § 16.29(b) ("The *investigation may include one or more* of the following, *at the sole discretion of the FAA* . . . .") (emphasis added). The Administration apparently determined more documentation was unnecessary and we cannot, from our

---

*FAA considers necessary* and by additional information furnished by the parties *at FAA request. In rendering its initial determination, the FAA may rely entirely on the complaint and the responsive pleadings provided under this subpart.*

14 C.F.R. § 16.29 (emphasis added).

(a) Under the authority of 49 U.S.C. § 40113 and 47121, the Director *may* conduct investigations, issue orders, and take such actions as are necessary to fulfill the purposes of this part, including the extension of any time period prescribed where necessary or appropriate for a fair and complete hearing of matters before the agency.

14 C.F.R. § 16.11 (emphasis added).

review of the record, conclude that this was an abuse of discretion.

Further, we note that the Administration clearly understood its authority to request supplemental information in the event that it determined that this information was necessary for resolution of the complaint.[5] Moreover, the Administration indicated that it was not reluctant to request additional, needed information.[6] The Administration apparently felt that it could decide the case without any additional materials, and we find no basis to conclude otherwise.

Finally, to the extent that Wilson argues that its due process rights were violated by the Administration's alleged failure to conduct further investigation and permit discovery–as distinct from its failure to hold an evidentiary hearing, which as

---

[5] In denying the motion for limited discovery, the Director noted:

The record shows that Wilson filed a reply to the answer with 38 exhibits and subexhibits without the need for limited discovery. The parties' other pleadings also contain ample supporting documentation. We are not convinced that production of additional documents is required. Should we find during the investigation of this matter that a specific document or category of documents are required to supplement the record we will request the same from the parties pursuant to our authority under 14 C.F.R. § 16.29.

J.A. 1073

[6] The order denying the discovery motion noted:

Depositions of witnesses are not required at this juncture and would unnecessarily delay the proceedings. Should the investigation find that there are relevant facts in dispute the FAA may adjudicate them based on the record, or it may exercise its discretion, and supplement the record by compelling production of additional documentary and/or oral evidence. 14 C.F.R. § 16.29.

J.A. 1074.

discussed we believe is not properly before this Court–we find that this argument lacks merit. To implicate the protections of the due process clause, there must be a deprivation of a property interest. *Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972). Wilson argues that it has a property interest as a beneficiary of the restrictive covenant in the Airport's deed prohibiting the creation of exclusive rights. Even assuming that Wilson has alleged a sufficient property interest so as to trigger the due process protections, we hold that the Administration's actions did not violate the due process clause.

The balancing test that we apply to determine how much process is due under these circumstances is "flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal quotation marks omitted). Thus, we consider the following three interests:

First, the private interest that will be affected by the official action; second the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Id.* at 335. We find that the balance of these interests weighs in favor of the Administration.

The first factor–the private interest at stake–weighs in favor of the Administration. As the First Circuit described in *Penobscot*, Wilson "essentially benefits from the covenant as any member of the public benefits from the requirement of non-exclusive access to the airport. [Wilson] stands to earn a certain amount of profits if the requirement is enforced, while members of the public as consumers, would benefit

from purchasing airport services at lower prices from more efficient companies." *Penobscot*, 164 F.3d at 723.

Likewise, we find that the second and third factors–the risk of an erroneous deprivation and the administrative burden of additional procedure–weigh in favor of the Administration. The Administration, while limiting its review of the complaint to the pleadings, conducted an extensive review of the voluminous record and produced a thorough and well-reasoned opinion. In so doing, contrary to Wilson's argument, the Administration followed the statutory procedures and federal regulations for review of a complaint brought pursuant to 14 C.F.R. Part 16. Although under the relevant statutory and regulatory framework the Administration had the authority to require more procedural process in investigating and resolving this complaint, this authority was at the Administration's discretion to exercise. *See* 14 C.F.R. §§ 16.11, 16.29. Requiring the Administration to do more than it has done in this case would not only constrain the Administration's discretion in resolving complaints brought pursuant to 14 C.F.R. Part 16, but it would also "force the [Administration] to over-invest procedurally in claims that might be assessed just as accurately without," requiring more procedural process. *Penobscot*, 164 F.3d at 724. Thus, under these facts, we hold that there was no violation of the due process clause.

## C. Unjust Economic Discrimination

Finally, Wilson argues that the Authority engaged in prohibited economic discrimination. An airport receiving funds under the Airport Improvement Program cannot engage in unjust discrimination, 49 U.S.C. § 47107(a)(1), (5).[7]

---

[7]Section 47107(a)(1), (5) provide:

(a) General written assurances. –The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives

Wilson argues that the Authority unjustly discriminated against it in violation of 49 U.S.C. 47 U.S.C. § 47107(a)(1), (5), by not offering Wilson the same rental rates, incentives and abatements that AMR received under the 1998 lease for General Aviation Building and South Complex. Also, Wilson argues that the Authority engaged in economic discrimination in favor of AMR by allowing AMR to acquire the option parcels to its exclusion. Wilson argues that these collectively hampered its ability to compete with AMR's fixed-base operation, resulting in unjust discrimination.

### 1. Rental Rates/Incentives/Abatements

Wilson raises a number of arguments alleging that the Authority's 1998 lease with AMR constituted economic discrimination against Wilson and in favor of AMR. First, Wilson argues that AMR's 1998 lease constituted a new leasing agreement and that the rates should have risen to reflect Wilson's rates. Second, Wilson argues that the Authority charged AMR less than the appraisal value for the six-acre taxiway. Third, Wilson argues that the rental rate that the Authority charged AMR for the General Aviation Building ($.0189 per square foot) as compared to the rental rate it offered to lease the Northwest Airlink building for ($6.00-$6.50 per square foot) demonstrates that the Authority engaged in unjust economic discrimination. Relatedly, Wilson argues that the rental rate that the Authority charged for the General Aviation Building and the one-year rent abatement that the Authority offered AMR was unjustified

---

written assurances, satisfactory to the Secretary, that--

(1) the airport will be available for public use on reasonable conditions and without unjust discrimination; . . .

(5) fixed-base operators similarly using the airport will be subject to the same charges . . . .

49 U.S.C. § 47107(a)(1), (5).

and constituted economic discrimination. Wilson argues that the fact that AMR was required to expend considerable sums of money for renovating these areas does not justify the low rental rates. Specifically, Wilson argues that these rental rates allowed AMR to avoid having to do the repairs itself, because AMR was able to keep its rent low for its subtenants, allowing for the subtenants to make the improvements. Wilson essentially argues that this constituted unjust discrimination because under its lease rates it could not reduce its subtenants' rent to a point that "would make it economical for them to" make required capital improvements. Each argument will be addressed in turn.

First, when the Authority negotiated the 1998 AMR lease, it preserved the rental rates for the South Complex that were provided in the 1979 lease through the original expiration date of the 1979 lease–2005. The Administration found that the Authority was "justified in choosing to live up to its prior, valid contractual agreements (i.e., the 1979 Lease) in an amended or 'new' lease document." The Administration reasoned that the fact that the rate differences would be effectively eliminated in 2005, when AMR's 1979 lease was set to expire, demonstrated that the Authority was honoring its previous agreement. Thus, the Administration concluded that to the extent that any rate disparities existed, they were not the result of economic discrimination, but rather were a consequence of the fact that the leases were negotiated at different times. *See Penobscot*, 164 F.3d at 726 (reasoning that different rental rates were justified by the different circumstances under which each lease was negotiated); *City of Pompano Beach v. FAA*, 774 F.2d 1529, 1544 (11th Cir. 1985) ("[O]ur affirmance of the hearing officer's findings and order is *not* a signal to cities and potential lessees of municipal property that all municipal leases must be identical."). We hold that this finding is supported by substantial evidence and is not arbitrary or capricious.

Second, with respect to Wilson's argument concerning the rental rate charged to AMR for the exclusive use of the six-

acre taxiway, the Airport's reconfiguration made the taxiway property unusable to others beside AMR. Although access to taxiways are generally free, the Authority assessed a rental value for that property because of AMR's exclusive use. The Administration found that the rate charged for AMR's exclusive taxiway use was comparable to the rates that the Authority charged Wilson and was the "then going rate for improved land." Wilson fails to offer any serious challenge to this reasoning. We hold that the Administration's findings of fact are supported by substantial evidence and its determination is not arbitrary, capricious or otherwise not in accordance with the law.

Third, the Administration determined that the rental rates and one-year rent abatement for the General Aviation Building were justified by its dilapidated condition and the requirement that AMR expend a considerable amount of money to recondition the building. We agree. Simply put, the buildings were not similarly situated. As the Director noted, the buildings varied in age, location, condition, potential uses and needed improvements. The statute prohibits only *unjust* discrimination, not all discrimination in rates. 49 U.S.C. 47107(a)(1). The Administration determined that the Authority is not statutorily prohibited from offering different lease terms for dissimilar properties. *See* FAA Order 5190.6A § 4-14(d)(1)(c) ("[A] sponsor may charge different rates to similar users of the airport if the differences can be justified as nondiscriminatory and such charges are substantially comparable."). This determination is "consistent with applicable agency guidelines and not in violation of the statute." *Penobscot*, 164 F.3d at 726.

Finally, we address Wilson's argument that although AMR was required to expend considerable sums of money under the 1998 lease to make renovations to the General Aviation Building, this did not justify the low rental rates that the Authority charged AMR. Wilson essentially argues that these low rental rates constituted unjust discrimination because it allowed AMR to avoid paying for the required capital

improvements under the 1998 lease while the rate that the Authority charged Wilson made it impossible to similarly avoid making capital improvements. Under its lease with the Authority, Wilson argues, it was unable to pass on low rental rates to its subtenants that would make it economical for the subtenants to make any improvements that Wilson's lease with the Authority required. We find this argument unpersuasive.

This argument essentially reiterates an argument that we have already addressed–namely, that the 1998 lease should not have continued the rental rates as established in the original lease agreements through the original expiration of those agreements. As we have already found, the Administration's determination that the Authority was justified in honoring its past contractual obligations with AMR is supported by substantial evidence and is not arbitrary or capricious. Moreover, while we reject Wilson's argument, we note Wilson's failure to present convincing evidence that AMR was able to pass on all of the costs to its subtenants to make the required improvements. While Wilson points to evidence suggesting that AMR's subtenants paid for the construction of the two new hangers as the 1998 lease required, our review of the record did not reveal that Wilson similarly presented evidence that AMR was able to pass on the costs to its subtenants for the millions of dollars that AMR was also required to expend under the 1998 lease to make improvements to the General Aviation Building. Finally, we note that the Authority's willingness to give Wilson similar abatements if it made capital improvements to the Northwest Airlink building seriously undermines Wilson's argument on this point.

In sum, we find Wilson's arguments regarding the rental rates, abatements and incentives contained in AMR's 1998 lease to be unconvincing. The Administration engaged in a searching and thorough review of the record. The Administration's findings of fact are supported by substantial evidence, and we hold that its determinations are neither

arbitrary or capricious nor "otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).

## 2.   Option Parcels/Land Allocation

Additionally, Wilson argues that the Authority engaged in unjust discrimination when it granted AMR the option parcels. Wilson argues that the evidence does not demonstrate that these parcels were given to AMR in exchange for its relinquishment of its leasehold in the North Complex and as the reasonably equivalent replacement of its North Complex investments. To this end, Wilson argues that the evidence demonstrates that AMR, itself, desired to be released from its lease in the North Complex, which suggests that the Authority was under no obligation to provide AMR with the option parcels in order to secure AMR's release. Moreover, Wilson argues that it was unjustly denied land to permit its expansion. Wilson argues that because AMR had no current need for the option acres, whereas Wilson has such a need, the exclusion of Wilson from these parcels constituted unjust discrimination. Furthermore, Wilson argues the comparison between the land allocation that the Authority has granted to AMR, as opposed to those parcels offered to it, demonstrates that the Authority has engaged in unjust discrimination. Specifically, Wilson compares the option parcels that were given to AMR and the Hurricane Creek parcel that it was offered. Wilson argues that the Hurricane Creek parcels are essentially unusable without the construction of a paved ramp across the parcel, and that it does not have the resources to undertake this costly project.

The Administration determined that the evidence reflected that the option parcels were indeed given to AMR in exchange for its release from the North Complex lease and that Wilson requested access to these parcels only after the Authority had already granted them to AMR. Indeed the Administration noted: "AMR was not granted a preferential right to additional land. Rather, the Option Parcels were in *exchange* for land released in the North Complex."

Additionally, the Administration determined that from the record it could not find that Wilson "was unjustly denied access to additional land for its [fixed-based operation] expansion purposes." As the Administration noted, the Authority offered Wilson additional land and even offered to shoulder some of the costs associated with making this land usable to Wilson by offering to pay for FedEx's relocation from this parcel. Moreover, the Administration determined that AMR's desire to relocate was not particularly relevant to the question of whether the Authority provided the option parcels in exchange for AMR's release of its North Complex holdings. We uphold these determinations.

Again, the Administration throughly reviewed the record and Wilson's arguments in rendering its decision. Based on this thorough review and comprehensive opinion, we conclude simply by noting that we find that Administration's findings are supported by substantial evidence and its determinations are not arbitrary or capricious.

## CONCLUSION

Based on the foregoing, we AFFIRM the decision of the Federal Aviation Administration.