*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0280p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

FLAMINGO EXPRESS, INC.,

*Petitioner,*

*v.*

No. 07-4226

FEDERAL AVIATION ADMINISTRATION,

*Respondent.*

The Petition for Review of a Decision and Order
of the Federal Aviation Administration.
No. 16-06-04.

Submitted: July 31, 2008

Decided and Filed: August 7, 2008

Before: KENNEDY, GILMAN, and GIBBONS, Circuit Judges.

---

### COUNSEL

**ON BRIEF:** Michael J. Schulte, LAW OFFICE, Covington, Kentucky, for Petitioner. Christopher J. Walker, Michael Jay Singer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

### OPINION

---

RONALD LEE GILMAN, Circuit Judge. The City of Cincinnati is the municipal owner and operator of the Cincinnati Municipal Lunken Airport (Lunken). Flamingo Express, Inc., which was already using Lunken to conduct chartered and unscheduled air service, sought an additional permit from the City in 2004 to operate scheduled commuter air service with seating for up to 30 passengers per flight. After the parties had unsuccessfully negotiated for more than a year and the City had still not approved Flamingo Express's application, Flamingo Express filed a complaint with the Federal Aviation Administration (FAA). The complaint alleged that the City had violated its obligations under federal law by, among other things, failing to approve Flamingo Express's application and requiring that the company obtain unreasonably high liability insurance coverage.

Following an informal investigation, the Director of the FAA Office of Airport Safety and Standards (the Director) dismissed Flamingo Express's complaint on the basis that the City had not violated its federal obligations. Flamingo Express then filed an administrative appeal with the FAA Associate Administrator for Airports (the Administrator). After the Administrator affirmed the Director's decision, this appeal followed. For the reasons set forth below, we **AFFIRM** the decision of the FAA.

1

# I. BACKGROUND

## A.    Regulatory framework

The City's ability to operate Lunken depends in part on the receipt of funds provided by the FAA as part of the Airport Improvement Program (AIP). *See* Airport and Airway Improvement Act of 1982, 49 U.S.C. § 47101 *et seq.*  As a condition of receiving AIP funds, the City is required to comply with the "written assurances" set forth in 49 U.S.C. § 47107.  The Administrator explained that "[u]pon acceptance of an AIP grant, the assurances become binding obligations between the airport sponsor and the Federal government."  Federal law, in turn, gives the Secretary of Transportation the authority to require that airport owners comply with these assurances. *See, e.g.*, 49 U.S.C. §§ 40101(c) & (d) (directing the Administrator of the FAA to consider safety, the public interest, and other factors in carrying out the provisions of the Federal Aviation Act); § 47107(a) & (b) (outlining the required assurances).

At issue in the present case is the City's obligation under Grant Assurance 22 ("Economic Nondiscrimination"), which implements subsections (1) through (6) of 49 U.S.C. § 47107(a).  That assurance requires that the sponsor of an airport receiving AIP funding "make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport."  Fed. Aviation Admin., Assurances, Airport Sponsors, Part C: Sponsor Certification, ¶ 22(a), *available at* http://www.faa.gov/airports_airtraffic/airports /aip/grant_assurances/media/airport_sponsor_assurances.pdf ("Grant Assurance 22(a)"); *see also* 49 U.S.C. § 47107(a)(1) (permitting approval of a grant application only if written assurance is provided that "the airport will be available for public use on reasonable conditions and without unjust discrimination").  An airport sponsor, however, "may establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport."  Fed. Aviation Admin., Assurances: Airport Sponsors ¶ 22(h).

Also relevant is the FAA's authority to issue Airport Operating Certificates (AOCs) to airports that serve passenger-carrying operations of certain air carriers and to establish safety standards for those airports.  *See* 49 U.S.C. § 44706.  The regulations governing the issuance of AOCs are contained in 14 C.F.R. Part 139, which was revised by an FAA rule that took effect in June of 2004.  *See* 69 Fed. Reg. 6380.  Prior to that time, there were two categories of AOCs: limited and unlimited.  The new certification process requires airports to be reclassified into one of four new classes (I-IV).

Under the new rule, airports may either surrender their AOCs or apply to the FAA to modify and/or downgrade their AOC classification.  Airport Safety & Operations Div., Fed. Aviation Admin., Program Policy and Guidance, Policy No. 75: Designation of Class of Certificate Under the Revised 14 C.F.R. Part 139 (June 10, 2004) ("FAA Policy 75").  Airports holding a limited AOC can seek reclassification as either a Class II or Class IV airport.  69 Fed. Reg. 6380-81.  Class II airports may serve both unscheduled large passenger aircraft (30+ seats) and scheduled small air carrier aircraft (10-30 seats), but Class IV airports may not serve the latter category. *Id.*  Either type of airport, however, may serve aircraft with nine seats or less.

Although certified airports have some flexibility in determining which class of AOC to seek, airports receiving federal assistance are limited by their "independent obligation, under the AIP grant assurances, to provide reasonable, not unjustly discriminatory access to the airport."  FAA Policy 75.  Airports receiving federal assistance are therefore required to ensure that scheduled and planned services are not impacted by the reclassification process, and cannot decline to meet the requirements for a certain AOC in order to prevent an air carrier from continuing or beginning such

service. *Id.*  As the Director explained, "the FAA would generally expect an airport operator to meet the requirements of the AOC that corresponds to the kinds of commercial operations at the airport at the time it applies for the new certificate, in order to meet the obligation for reasonable . . . access."

FAA Policy 75, issued in conjunction with the implementation of the revised AOC procedures, specifically addresses how an airport must account for planned service when applying for a new AOC:

> The FAA generally treats planned service the same as existing service if the operator (1) is able to actually begin service, i.e. to have the use of necessary facilities and equipment, and have the necessary Department of Transportation and FAA authority to operate scheduled air transportation, and (2) has filed formal notice with the airport operator of intent to begin service within a reasonable time, e.g. 2-6 months.

FAA Policy 75.

## B.    Factual background

Lunken is a "reliever airport" located in Cincinnati, Ohio whose primary function is to "serve[] the aviation needs in the tri-state area by providing needed runway capacity and landside support facilities relief to the Cincinnati/Northern Kentucky International Airport."  Prior to 2004, Flamingo Express conducted various air services at Lunken with a nine-seat, single-engine Piper Cherokee aircraft.  The company operated these services with a certificate issued by the FAA under 14 C.F.R. Part 135.

In April of 2004, Flamingo Express submitted a permit application to the City in which the company sought approval to operate scheduled commuter service with aircraft seating less than 30 passengers but more than 9 passengers.  Such service requires Flamingo Express to obtain certification from the FAA pursuant to 14 C.F.R. Part 121.  Flamingo Express does not dispute that it never sought such certification from the FAA.  At the time that Flamingo Express submitted its application to the City, Lunken held a limited AOC.  The Director noted that "[t]his level of certification allowed it to serve charter or unscheduled operations and scheduled operations of 30 seats or less."

Both the City's airport manager and its risk manager approved Flamingo Express's application within a month of its submission.  Flamingo Express then proceeded to submit a preliminary proposal to the City in the form of an operating agreement.  In August of 2004, the City held a public hearing on the permit and the proposal.  After receiving complaints from Flamingo Express about the delay in approving the permit and proposal, the City responded to Flamingo Express in January of 2005 by providing its own proposed operating agreement.  The agreement would have permitted Flamingo Express to operate scheduled commuter flights using aircraft with only nine seats or less, required a $200-per-month fee for up to 40 flights with a $5 surcharge for each flight thereafter, and mandated that Flamingo Express obtain liability insurance coverage in the amount of $20 million per occurrence.

Between February and July of 2005, Flamingo Express and the City exchanged numerous letters in an attempt to solidify the terms of the proposed agreement.  Flamingo Express argued that the City's proposal was unreasonable because it (1) did not permit Flamingo Express to conduct the service that it had requested, (2) required a $20 million minimum insurance policy even though the company's current insurance coverage of $1 million was consistent with industry standards, and (3) included an excessive monthly fee.

The City, in turn, alleged that the agreement under consideration was for aircraft with nine seats or less because that was what Flamingo Express

> proposed when [it] applied for this license. At that time, it was discussed and agreed upon with [Flamingo Express] that we would revisit this issue if and when [Flamingo Express] was going to upgrade to bigger planes. Since we have not received any indication from them of such an intention, we developed the agreement based on their proposal and our mutual concurrence on this issue.

The City also defended the reasonableness of the monthly-fee and minimum-insurance requirements. No agreement was reached during this exchange of correspondence, and at one point the City suggested that if Flamingo Express was "not willing to move on these issues[, it] should consider withdrawing [its] application."

At some point during the time period that Flamingo Express's application was pending, the City applied to the FAA for a Class IV AOC reclassification. In December of 2005, the City received the Class IV AOC. The Director explained that this reclassification means that "[a]lthough the City's Limited AOC would have allowed Lunken to serve scheduled operations of 30 seats or less . . . , the new Class IV AOC does not."

In summary, the parties contemplated three possible options for air services by Flamingo Express at Lunken. The pre-2004 arrangement, in which Flamingo Express conducted chartered and unscheduled air services using a nine-seat plane, continued to be a viable option even after Lunken became a Class IV airport. Flamingo Express's new proposal, on the other hand, contemplated scheduled air service for 10 to 30 passengers per flight and carried with it Flamingo Express's current liability insurance coverage of $1 million. The third option, proposed by the City, would have permitted Flamingo Express to operate scheduled service using a nine-seat plane and carried with it a $20-million-insurance requirement. Flamingo Express refused to accept the City's proposal.

## C.        Procedural background

In March of 2006, Flamingo Express filed a complaint with the Director. *See* 14 C.F.R. §§ 16.21, 16.23 (permitting persons "doing business with an airport" to file a complaint with the FAA, provided that they first "engage in good faith efforts to resolve the disputed matter informally"). That complaint was subsequently dismissed without prejudice because it was incomplete. Flamingo Express refiled its complaint two months later. The complaint alleged that the City had violated its obligation to comply with federal statutes and FAA regulations by (1) failing to allow Flamingo Express to conduct the requested aircraft service and seeking recertification from the FAA that would prohibit Flamingo Express from operating such service at Lunken, (2) demanding unreasonable fees, and (3) requiring insurance coverage that was "contrary to industry standards as well as the City's own Airport Minimum Liability Insurance Requirements." Flamingo Express also argued that the City's undue delay in processing the application constituted a violation of federal regulations.

In February of 2007, the Director issued a Director's Determination, concluding that the City had not violated its obligation under 49 U.S.C. § 47101(a) to operate Lunken on reasonable terms and without economic discrimination. The Director found no evidence indicating that the City had deliberately delayed the application process and concluded that the time lapse was reasonable. It then proceeded to address Flamingo Express's substantive complaints and determined that although Flamingo Express had submitted an application for the use of 10-to-30-seat aircraft, the City had not violated its federal obligation to provide reasonable access by seeking to downgrade its FAA classification. Specifically, the Director found that Flamingo Express had not taken sufficient steps

"to be considered a realistic prospective operator" of the proposed service and that, therefore, the City was not obligated to refrain from downgrading its certification.

The Director also concluded that although the City "cannot impose a $20 million in liability coverage requirement for operation of a 9-seat . . . aircraft," such a requirement would be reasonable for the type of service that Flamingo Express had actually proposed in its application. Finally, the Director determined that the monthly fee required by the City was reasonable.

Flamingo Express then pursued an administrative appeal with the Administrator. *See* 14 C.F.R. §§ 16.31(c), 16.33 (permitting such appeals and providing procedures for filing). That appeal challenged the Director's Determination only with respect to (1) the City's refusal to approve the application for 10-to-30-seat aircraft service, and (2) the $20-million-liability-insurance requirement. In August of 2007, the Administrator issued a Final Decision and Order affirming the Director's decision. The Administrator concluded that the factual findings made by the Director "are supported by a preponderance of reliable, probative, and substantial evidence," and that the legal conclusions reached are "in accordance with applicable law, precedent, and public policy."

In particular, the Administrator agreed with the Director's determination that Flamingo Express had not taken "steps sufficient to demonstrate substantial or realistic intent" to operate the requested service and that the FAA "would not expect an airport sponsor" to maintain a certain certification level "based on 'unsubstantiated and unrealistic' proposals." The Administrator also affirmed the Director's conclusions with respect to the insurance requirement, explaining that the required amount would be reasonable for the operations that Flamingo Express wanted to conduct. Moreover, the Administrator noted that Flamingo Express could request a new operating agreement from the City if it wished to conduct scheduled service of nine seats or less. In that circumstance, the City "must be given an opportunity to revise its insurance requirement for aircraft seating 9 or less passengers to reflect the Director's finding." The Administrator also recognized that if future informal efforts to resolve the issue were unsuccessful, Flamingo Express would also have the option of filing a new formal complaint against the City.

Flamingo Express timely filed a Petition for Review with this court. *See* 14 C.F.R. § 16.247(a) (authorizing judicial review of an Administrator's final decision). Although both the City and the FAA were listed as respondents, the FAA correctly points out that the FAA is the proper respondent and that the City is not a party to this appeal.

## II. ANALYSIS

### A.    Standard of review

"When reviewing an order of the [FAA], we apply the standards of review as articulated in the Federal Aviation Act, 49 U.S.C. § 46110(c), and by default, the Administrative Procedure Act, 5 U.S.C. § 706." *Wilson Air Ctr., LLC v. FAA*, 372 F.3d 807, 812 (6th Cir. 2004). We apply the standards articulated in the Administrative Procedure Act only where the Federal Aviation Act does not provide the appropriate standard. *See id.* at 813.

The Federal Aviation Act dictates that findings of fact made by the FAA are "conclusive" if supported by substantial evidence. 49 U.S.C. § 46110(c). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wilson Air Ctr.*, 372 F.3d at 812-13 (internal quotation marks omitted). We must consider the entire record, including evidence that contradicts the FAA's findings. *Id.* at 813. But "[s]ubstantial evidence review gives the agency the benefit of the doubt," requiring "not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree which could satisfy a reasonable factfinder." *Id.* (internal quotation marks and emphasis omitted). Thus, "[e]ven if two

different conclusions can be drawn from the evidence, we may still find that the agency's factual findings are supported by substantial evidence." *Id.*

The Federal Aviation Act is silent as to the standard that an appellate court must employ in reviewing the FAA's nonfactual findings, so "we must look to the Administrative Procedure Act to supply the appropriate standard of review." *Id.* Although questions of law are reviewed de novo, 5 U.S.C. § 706, "we must give some deference to the agency because it is charged with administering the statute." *Wilson Air Ctr.*, 372 F.3d at 813. Under the Administrative Procedure Act, moreover, the FAA's interpretation of its own regulations "must be given controlling weight unless it is 'plainly erroneous or inconsistent with the regulation.'" *See Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 409 (6th Cir. 2007) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). All other findings and conclusions are reviewed to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## B.     Flamingo Express's claims

The only two issues before us on appeal are whether the FAA erred in rejecting Flamingo Express's claim that the City violated its federal obligations by (1) failing to approve Flamingo Express's application seeking to operate scheduled air service with seating for 10 to 30 passengers per flight, and (2) requiring Flamingo Express to obtain $20 million in liability insurance coverage. We will address each of these issues in turn.

### 1.     *Application to operate aircraft with between 10 and 30 seats*

Flamingo Express argues that both the Director and the Administrator erred in concluding that the City did not violate Grant Assurance 22(a) by failing to approve the company's permit application. Specifically, Flamingo Express points to the fact that the City has refused to even acknowledge that the application was for aircraft seating 10 to 30 passengers and has instead consistently claimed that the initial application was for aircraft with 9 seats or less. According to Flamingo Express, this blatant mischaracterization of the application is evidence that "the permit was wrongfully denied by the City." The company also disputes the FAA's conclusion that Flamingo Express's service was not sufficiently "planned" to require the City to seek a Class II, rather than a Class IV, AOC.

With respect to the City's mischaracterization of Flamingo Express's application, both the Director and the Administrator acknowledged that the City's position on this issue was erroneous, and that the version of Flamingo Express's application submitted by the City had been "visibly altered." The Director explicitly stated that, contrary to the City's contention, Flamingo Express never "agree[d] to limit its operations to only nine seats or less" and that such a limitation "has always been at the insistence of the City." According to Flamingo Express, the Director and Administrator erred by failing to draw the proper legal conclusion from that factual finding (i.e., that its application had been "wrongfully denied").

Based on the record, Flamingo Express has reason to believe that the City engaged in inappropriate conduct to prohibit Flamingo Express from beginning the scheduled service that it had requested. The Director determined as much, noting that "information in the record supports the conclusion that the City intended to limit the air carrier service sought by Complainant." But the problem with Flamingo Express's argument is that it has provided no legal authority whatsoever for the proposition that the City's actions—even if intentional—constituted a per se violation of its obligation to "make its airport available . . . for public use on reasonable terms." *See* Grant Assurance § 22(a).

Rather, as the Director and the Administrator both explained, the relevant issue under FAA policy and regulations is whether Flamingo Express's proposed service was "sufficiently realistic to be considered 'planned,' for the purpose of determining reasonable access." Only under such circumstances would the City have wrongfully sought a Class IV AOC in violation of its federal obligations, because FAA policy "generally treats planned service the same as existing service." FAA Policy 75.

But the FAA does not require an airport to maintain a certain certification level on the basis of "unsubstantiated or unrealistic proposals." FAA regulations also impose certain requirements on the service operator. Thus, before an airport is required to ensure reasonable access through its AOC classification, an operator must demonstrate that it (1) "is able to actually begin service, i.e. to have the use of necessary facilities and equipment, and *have the necessary Department of Transportation and FAA authority to operate scheduled air transportation*," and (2) "has filed formal notice with the airport operator of intent to begin service within a reasonable time." FAA Policy 75 (emphasis added).

Because Flamingo Express had given notice of its intent to begin service by filing its permit application, the City would have violated its federal obligations by seeking to downgrade its AOC if Flamingo Express had been "able to actually begin service." *See id.* ("The FAA has considered an operator prevented from starting service to be 'directly and substantially affected' by the airport's actions, and has accepted a complaint from the operator."). But the Director found that Flamingo Express was not able to actually begin service because it did not have a Part 121 certificate from the FAA—a necessary precondition to conducting the type of air service that it had proposed. According to the Director, Flamingo Express had also failed to "engage[] the FAA for its Part 121 certification, such as a Pre-Application Statement of Intent (PASI) and Schedule of Events (SOE) submitted to the Cincinnati FAA Flight Standards District Office (FSDO)."

Flamingo Express has not challenged these factual findings, and a review of the record demonstrates that the findings are supported by substantial evidence. Moreover, both the Director and the Administrator agreed that, under FAA policy, "[f]or an applicant to be considered a realistic prospective operator necessitating action from an airport sponsor in terms of changing an existing Part 139 Airport Operating Certificate (AOC), the prospective Part 121 operator should, at a minimum, have filed its PASI and SOE with the local FAA FSDO." Based on Flamingo Express's failure to do so, the FAA maintains that the company "had not established 'planned service' for FAA purposes, and thus the City of Cincinnati had no federal obligation to accept the proposal and refrain from downgrading to a Class IV airport."

Flamingo Express, for its part, contends that "[w]hether Flamingo obtained Part 121 Certification, or contractually aligned itself with a Part 121 operator, as was its intent, it could not effectuate its plan . . . without a permit" from the City. But the Administrator addressed Flamingo Express's contention that it intended to contract with a Part 121 operator, finding no evidence in the record to support this assertion.

More fundamentally, however, Flamingo Express's argument fails because it is at bottom an attempt to sidestep both the FAA's policy and the agency's factual findings. Flamingo Express essentially seeks to reverse the order in which it was required to take the steps necessary to begin operating the service that it had requested. FAA policy clearly states that certification from the FAA is essential to qualifying as planned service. *See* FAA Policy 75. Flamingo Express's assertion to the contrary, without the support of any legal authority, is simply not enough to persuade us that the FAA's interpretation of its policy on planned service was either "plainly erroneous or inconsistent with the regulation." *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose." (citations

omitted)). For these reasons, we agree with the FAA that, the City's motivations notwithstanding, the City did not violate its federal obligations by refusing to approve Flamingo Express's proposed scheduled service with aircraft seating 10 to 30 passengers.

### 2.        *Liability-insurance requirement*

Flamingo Express also challenges the FAA's conclusion that the City's proposed $20 million liability-insurance requirement was neither unreasonable nor unjustly discriminatory. The FAA, in response, contends that Flamingo Express has failed to "challenge *any* of the FAA's determinations on point."

We agree with the FAA. The relevant findings made by the Director are that (1) the City's $20 million coverage requirement would be reasonable for a "twin-engine turboprop seating 20 or so passengers engaged in Part 121 scheduled air service operations," and (2) such a requirement would *not* be reasonable for an aircraft that seats up to 9 passengers. A review of the record demonstrates that the Director conducted significant independent investigation in determining how much insurance coverage would be reasonable for scheduled service with both a 9-seat aircraft and a 10-to-30-seat aircraft. Flamingo Express provides no evidence to contradict the Director's findings on this score and, in any event, those findings are conclusive because they are supported by substantial evidence.

Nevertheless, we again feel obliged to note that the City's position in its negotiations with Flamingo Express was at best contradictory. The City maintained, on the one hand, that Flamingo Express was requesting 9-seat service when the company had clearly submitted an application for 10-to-30-seat service. At the same time, however, the City's proposed liability-insurance requirement was consistent with the latter type of service and, as the Director found, "unobtainable" for the former. These inconsistencies support the inference that the City intended to prevent Flamingo Express's proposed service, in violation of its assurance to make Lunken available "for public use on reasonable terms, and without unjust discrimination, to . . . commercial aeronautical activities offering services to the public at the airport." *See* Grant Assurance 22(a).

But according to the FAA, the agency "refused to find the City noncompliant for requiring the $20 million requirement for a 9-seat aircraft, because Flamingo Express's complaint specified the fact that it wanted to conduct scheduled operations with aircraft seating less than 30 but more than 9 passengers." Flamingo Express, therefore, was not "directly and substantially affected by the City's insurance requirement for such an aircraft." In other words, Flamingo Express's own insistence on the type of service that it wished to conduct precluded a finding that the insurance requirement was unreasonable, because such a requirement would actually be reasonable for the requested service.

We agree with the analysis presented by the FAA. Both the Director and the Administrator recognized that the City's insurance requirement was inconsistent with its own position, but correctly noted that such a requirement was not actually unreasonable for the type of service being sought by Flamingo Express. The FAA's conclusion is therefore neither inconsistent with the regulations at issue nor an abuse of the agency's discretion. For these reasons, we decline to reverse its resolution of Flamingo Express's claim.

Finally, we note that Flamingo Express's contention that the FAA has effectively endorsed the City's attempts to prohibit Flamingo Express "from operating *any* scheduled service, even scheduled service of aircraft up to nine seats," is a substantial exaggeration. The Administrator specifically stated that Flamingo Express could accept the City's proposal for scheduled service of up to nine seats and that the City could not impose a $20-million-coverage requirement for such service. We also note that the FAA has consistently maintained that if good-faith efforts at informal dispute resolution fail, Flamingo Express may file a new formal complaint pursuant to 14 C.F.R.

Part 16.  The FAA has thus left open the possibility of a compromise between the parties that would permit Flamingo Express to operate scheduled service using a nine-seat plane, while preventing the City from requiring an unreasonable amount of insurance for that service.  We likewise hope that the City and Flamingo Express will reach a negotiated resolution that elevates the public's interest over their own past disagreements.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the FAA.